UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ALPHA PAINTING & CONSTRUCTION
COMPANY, INC.,

              Plaintiff,

    v.

DELAWARE RIVER PORT AUTHORITY
OF THE COMMONWEALTH OF
PENNSYLVANIA AND THE STATE OF
NEW JERSEY,

              Defendant.

1:16-cv-05141-NLH-AMD

**OPINION**

---

**APPEARANCES**:

PETER J. TORCICOLLO
KEVIN W. WEBER
KAITLYN E. STONE
GIBBONS, PC
ONE GATEWAY CENTER
NEWARK, NJ 07102-5310
    On behalf of Plaintiff

STEWART JOHN GREENLEAF
THOMAS J. ELLIOTT (pro hac vice)
ELLIOTT GREENLEAF PC
UNION MEETING CORPORATE CENTER V
925 HARVEST DRIVE
SUITE 300
BLUE BELL, PA 19422
    On behalf of Defendant

**HILLMAN, District Judge**

    Presently before the Court is the motion of Plaintiff,

Alpha Painting & Construction Company, Inc., for a preliminary

injunction and judgment in its favor pursuant to Federal Civil

Procedure Rule 65 and Local Civil Rule 65.1, on its claims

relating to its bid on a contract to paint the Commodore Barry Bridge, which is operated by Defendant, Delaware River Port Authority. For the reasons expressed below, the Court will grant Judgment in favor of the Plaintiff and direct the Defendant to award the disputed contract to the Plaintiff.[1]

## BACKGROUND

The Commodore Barry Bridge is a five-lane, 14,000 foot span of the Delaware River between Chester, Pennsylvania and Bridgeport, New Jersey. Due to deteriorating lead-based paint on the bridge, the DRPA instituted a project to remove the existing paint by sand-blasting the bridge to the bare metal and applying three coats of a non-lead-based protective coating. Safety is a major concern of this project. During the sand-blasting process, the lead paint must be contained and remediated through specific methods and equipment so that it does not harm the workers, the public, or the environment. In addition to the issues that the old lead paint presents, the

---

[1] On September 19, 2016 this Court entered a temporary restraining order (Docket No. 33) precluding Defendant from awarding the disputed contract pending this Court's decision on Plaintiff's application. On September 22, 2016, Defendant filed an Emergency Motion for the Dissolution of the Temporary Restraining Order. (Docket No. 34.) A hearing was set for Monday, September 26, 2016 at 3:00pm. (Docket No. 35.) Because the Order accompanying this Opinion will dissolve the temporary restraining order and impose a permanent injunction consistent with this Opinion, the Defendant's Emergency Motion is moot and the hearing is cancelled.

precarious nature of bridge painting requires the application of strict safety measures to ensure the safety of the painters, DRPA employees, and the public who travel on and under the bridge.

The DRPA has separated the bridge painting project into three phases.  Phase I encompasses the New Jersey approach span of the bridge, Phase II entails painting the Pennsylvania approach span and the adjacent toll plaza in New Jersey, and Phase III completes the project by painting the bridge's main cantilevered structure in the middle.  Phase I is almost complete, with Corcon, Inc. ("Corcon") having performed the work on that phase.

In May 2016, DRPA issued an Invitation for Bid ("IFB"), soliciting bids for Contract No. CB-31-2016 to complete Phase II.  On May 17, 2016, DRPA held a pre-bid conference so that project bidders could examine the contract documents, become aware of the scope and requirements of the project, and visit the site prior to submitting their bids.  Sealed proposals for the contract were due on June 16, 2016 at DRPA headquarters no later than 2:30 pm.

Seven bid proposals were submitted.  The bidders, DRPA employees, and other interested parties gathered in a DRPA conference room to observe the public opening of the bids and the announcement of the apparent lowest bidder.  The DRPA

3

contract administrator opened each sealed bid one-by-one, and read aloud the total bid price for each bid.  Alpha[2] had the lowest bid of $17,886,000.00, making it the apparent lowest bidder.  Corcon was the apparent second lowest bidder with a bid of $17,896,200.00 — a $10,200.00 difference between the two bids.[3]

DRPA's procurement manual requires that the award of contracts "must be made to the lowest responsible bidder whose bid meets the requirements and criteria set forth in the [Invitation for Bids] unless all bids are rejected or the lowest responsible and responsive bidder is allowed to withdraw his or her bid."  (Docket No. 1-1 at 14.)  Six weeks later, on July 28, 2016, after an undocumented process shrouded in mystery and obscured from public scrutiny, the DRPA notified Alpha by an undated letter that it had determined that Alpha was "not

---

[2] Alpha is an industrial painting contractor, and its primary business is the painting of bridges.  Alpha is prequalified to perform work in more than forty (40) states.  In New Jersey and Pennsylvania, Alpha is prequalified to perform: projects up to a value of $200 million for the New Jersey Department of Transportation; projects up to a value of more than $66 million for the Pennsylvania Department of Transportation; and projects up to an unlimited value for the New Jersey Turnpike Authority.

[3] The seven bids were: Liberty Maintenance, Inc. $25,465,270.00; Corcon, Inc. $17,896,200.00; Blastech Enterprises, Inc. $18,318,125.00; Jupiter PCCC, Inc. $21,395,000.00; Allied Painting, Inc. $18,364,225.00; Alpha Painting & Construction Co. $17,886,000.00; M&J Paint Co. $25,417,200.00.

responsible," and rejected its bid.  Following the rejection of
Alpha's bid protest, at a public DRPA Board of Commissioners
meeting on August 17, 2016, DRPA's Board of Commissioners
approved the recommendation of the DRPA's Operations &
Maintenance Committee and awarded the Phase II painting contract
to Corcon.[4]  As with the earlier decision of the Operations &
Maintenance Committee, the full Board's decision was made
without any public discussion of the reasons for the selection
of Corcon or the rejection of the Alpha bid and protest.

This case primarily, although not exclusively, hinges on
what occurred between June 16, 2016, when Alpha was deemed the
apparent lowest bidder, and July 28, 2016, when the DRPA
rejected Alpha's bid.  Alpha claims that DRPA's decision to
reject its bid was arbitrary and an abuse of discretion, and a
result of DRPA's desire to award the contract to Corcon, which
is the company currently performing the Phase I contract.  DRPA
contends that it complied with DRPA's Procurement Manual and it
determined objectively to reject Alpha's bid and award the
contract to the next lowest bidder.  It also argued initially[5]

---

[4] Alpha filed a bid protest on July 29, 2016, which the DRPA
denied on August 4, 2016.  On August 9, 2016, Alpha filed an
appeal of the denial, and on August 12, 2016 its appeal was
denied.  At the same time the DRPA denied Alpha's appeal, DRPA's
Operations & Maintenance Committee recommended to the DRPA's
Board of Commissioners to award the contract to Corcon.

[5] Defendant's post-trial submissions appear to abandon this

5

that Corcon is actually the lowest bidder after it corrected a
"miscalculation" in the Corcon bid.

At Alpha's request to consolidate its application for
preliminary injunction with a trial of the action on the merits
pursuant to Fed. R. Civ. P. 65(a), and with no objection from
DRPA, the Court presided over three full days of testimony from
the parties.  The Court has considered that testimony, the
parties' closing arguments, and the pre- and post-hearing
submissions in issuing this decision.[6]

**DISCUSSION**

A.   **Subject matter jurisdiction**

Plaintiff Alpha Painting & Construction Company, Inc. is a
corporation duly incorporated under the laws of the State of
Maryland, having its principal place of business at 6800 Quad
Avenue, Baltimore, Maryland 21237.  Defendant Delaware River
Port Authority of the Commonwealth of Pennsylvania
and the State of New Jersey ("DRPA") is a public entity
authorized by Congress and created by an interstate compact

---

argument.  In any event, for the reasons explained infra pp. 26-
30, that contention is meritless.

[6] As set forth below, the sole relief sought by Plaintiff is a
permanent injunction awarding it the disputed contract.  Because
the only relief sought is equitable and neither party has
otherwise sought a right to a jury trial, this Court has acted
as the factfinder.  This Opinion and accompanying Order
represents the Court's findings of fact and conclusions of law.

between the State of New Jersey and the Commonwealth of
Pennsylvania ("DRPA Compact"), enabled by N.J.S.A. 32:3-1 et
seq. and Pa. Cons. Stat. 3503 to 3509, for the purpose of
developing and maintaining bridges and port facilities between
the two states, including the Ben Franklin, Walt Whitman,
Commodore Barry, and Betsy Ross bridges.  DRPA has its principal
place of business at One Port Center, 2 Riverside Drive, Camden,
New Jersey 08121.

This Court has jurisdiction over this action pursuant to 28
U.S.C. § 1332 because the amount in controversy exceeds the sum
of $75,000.00 exclusive of interest and cost, and there exists
complete diversity between the parties to this dispute.[7]

**B.   Standard for applications pursuant to Fed. R. Civ. P.
65 and L. Civ. R. 65.1**

A party seeking a preliminary injunction must show: (1) a
likelihood of success on the merits; (2) that it will suffer
irreparable harm if the injunction is denied; (3) that granting
preliminary relief will not result in even greater harm to the

---

[7] The Court has previously questioned whether subject matter
jurisdiction may be exercised over DRPA pursuant to 28 U.S.C. §
1331, when no diversity of citizenship exists between the
parties.  See Delaware River Port Authority v. Fraternal Order
of Police Penn-Jersey Lodge No. 30, Civil Action 16-1285
(NLH/JS), Docket No. 4.  Such issues turn on whether the case
implicates the interstate compact itself, which perforce raises
a federal question, or merely issues of state or common law
which do not raise possible conflicts with or interpretations of
the compact.  The Court does not need to address that issue in
this case because jurisdiction under § 1332 is satisfied.

nonmoving party; and (4) that the public interest favors such relief.  Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances.  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).

Even though it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits, should an expedited decision on the merits be appropriate, Rule 65(a)(2) of the Federal Rules of Civil Procedure provides a means of securing one.  That Rule permits a court to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."  Before such an order may issue, however, the courts have commonly required that the parties should receive clear and unambiguous notice of the court's intent to consolidate the trial and the hearing, either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases.  Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (citations omitted).  This procedure was followed here with the consent of the parties.

**C.   Standard for reviewing the decision of the DRPA**

"[I]t is inherent in a case of this kind that it is likely that there will be a factual dispute with respect to the

ultimate question of whether a bidder is the lowest qualified and responsible bidder." Allied Painting, Inc. v. Delaware River Port Auth. of Pennsylvania & New Jersey, 185 F. App'x 150, 151 (3d Cir. 2006). This is because the "resolution of the question requires an agency seeking bids to exercise its judgment in a way that ordinarily it cannot do with mathematical precision." Id. Accordingly, a decision of the DRPA may be overturned "only if its decision was the product of 'an abuse of discretion or was arbitrary, unreasonable, or irrational.'" Id. (quoting Princeton Combustion Research Labs. v. McCarthy, 674 F.2d 1016, 1021–22 (3d Cir. 1982)).

**D.   Analysis**

**The Stated Reasons Why Alpha's Bid Was**
**Rejected Are Arbitrary, Capricious and Not Rational**

Alpha's bid was rejected for two reasons: its bid package was missing OSHA 300 forms, and it did not fulfill a bid requirement that it have what are called in the insurance industry as "experience modification factors" ("EMF") for the previous three years arising from work in either New Jersey or Pennsylvania.[8]  (Docket no. 1-2 at 39.)

---

[8] Putting aside for a moment the implications of DRPA allowing Corcon, but not Alpha, to supplement the safety metrics described by the bid requirements, see infra at 23-25, and the very limited window EMF provides to assess the safety risk a contractor poses, the EMF requirement is a curious choice with potentially profound implications for DRPA's self-professed desire to choose "safe" contractors for bridge work.  The Court

**The "Missing" OSHA 300 Forms**

Under OSHA's recordkeeping regulations, certain covered employers are required to prepare and maintain records of serious occupational injuries and illnesses using the OSHA 300 Log of Work-Related Injuries and Illnesses (OSHA Form 300), the Summary of Work-Related Injuries and Illnesses (OSHA Form 300A), and the Injury and Illness Incident Report (OSHA Form 301). Employers must fill out the Log and the Incident Report only if a recordable work-related injury or illness has occurred. Employers must fill out and post the Summary annually in the

---

heard testimony that EMF factors are calculated by insurance regulators in only New Jersey and Pennsylvania and that DRPA will approve a contractor as "safe" even if its workers' compensation safety record is so poor it must pay a premium as high as one and one-quarter percent over standard rates. This means two things. First, under DRPA bid standards a contractor who has not performed any work in Pennsylvania or New Jersey over the relevant time period, regardless of its nationwide safety record, can never satisfy DRPA's metric of a workers' compensation track record (even though such records exist elsewhere in the insurance industry for work in other states, and testimony establishes are easily found). Second, an incumbent contractor who has recently received work from DRPA will automatically meet the bid requirements even if its workers' compensation history is considered subpar by the insurance industry. As the Court observed at the hearing in this matter, the testimony established that a company can paint the Golden Gate Bridge for ten years in a row and not hurt so much as a sea gull and it will lose a DRPA bridge contract to an incumbent contractor who has to pay a penalty rate for insurance based on its recent employee injury records in New Jersey or Pennsylvania. There are several reasons - some honorable, some not – as to why DRPA might construct its bid requirements to favor incumbent contractors already doing local work, but a principled and rational focus on safety is not one of them.

workplace, even if no recordable work-related injuries or illnesses occurred during the year.[9]

Much of the focus of the testimony centered on whether Alpha provided OSHA 330 forms in its sealed bid package and, if so, what happened to them.  Alpha's bid package was prepared by S. Tom Kousisis, Alpha's General Project Manager, who testified that he included the required forms in his sealed bid package. He testified that he specifically recalls putting the OSHA 300 forms with the other exhibits attached to the Velo-bound bid book because he had to fold the legal-size paper the forms are printed on to fit in the standard-size envelope.  It is uncontroverted that he checked the box on the bid book's check-list to indicate that the OSHA 300 forms were included with the bid.

Amy Ash, DRPA's Acting Manager of Contract Administration, and Adam Jacurak, DRPA's Senior Engineer, who oversaw the bid-opening process, testified that when they flipped through Alpha's bid immediately after the bid opening, Jacurak noticed that the OSHA 300 forms were missing.  Both sides agree that

---

[9] Testimony at trial established that although OSHA 300 forms must be tabulated and posted at work places, the forms are not provided to the government and are not used by the federal government for the purpose of assessing a company's safety record or compliance with OSHA regulations other than the posting requirement.

Alpha did supply a signed letter and print-out from OSHA's website regarding its workplace incidents, a set of materials Jacurak was not sure would meet the requirements of the IFB.[10] Ash testified that no loose papers were left on the floor or anywhere in the conference room.

Alpha did not keep a photocopied version of the entire bid package it submitted to DRPA.[11]  Alpha's original bid package provided by DRPA at the hearing before this Court had been altered by Amy Ash from its original state when it was submitted by Alpha – the Velo binding had been removed, and the exhibits had been inserted into the appropriate sections of the bid package.[12]  No OSHA 300 forms were included.

_____

[10] According to OSHA, "In place of the OSHA forms, employers may also use equivalent forms (forms that have the same information, are as readable and understandable, and are completed using the same instructions as the OSHA forms they replace).  Many employers use an insurance form instead of the Incident Report, or supplement an insurance form by adding information required by OSHA."  https://www.osha.gov/recordkeeping2014/records.html.  Indeed, Alpha's letter stated that Alpha "did not have any recordable injury or sickness on [its] OSHA logs for the past three years relative to PA or New Jersey work."  (Def. Ex. 22 at Attachment K; Tr. 364:16-20.)  Defendant has not challenged the accuracy of Plaintiff's letter.

[11] Kousisis testified that he retained electronic copies of the bid package and all the exhibits, but he did not photocopy the entire bid package prior to submission because the voluminous bid package was Velo-bound and could not be separated for copying.

[12] The Court must pause to note that the ability of bidders to submit their bids electronically would eliminate tedious litigation as to the location and content of paper documents.

Even though the Court finds the evidence in equipoise[13] as to whether OSHA 300 forms were in fact in Alpha's bid package,

---

Ash and Jacurak testified inconsistently as to the manner in which the bid documents from all the bidders were handled, conveyed, and stored raising entirely preventable concerns about chain of custody and the integrity both of the process and the documents themselves.  Plaintiff has made much about their claim that their bid package included the OSHA 300 forms.  Ash and Jacurak are equally adamant that those forms were not in the envelope when they opened and examined it.  Electronic bid packages frozen in time and secure in content and accompanied by a metadata chain of custody would have eliminated all of the ambiguity and consternation and greatly simplified or even prevented this case.  Such a process could easily password protected submissions and other encryption and other electronic means to protect the integrity of the bid process.  Indeed, Ash acknowledged both the availability and wisdom of such procedures.  DRPA awards contracts worth millions of dollar and does so regularly.  It is 2016.  Much was made of the gigantic scissors Ash uses to open the sealed bids during what is a quaint but antiquated public unsealing.  It is time for DRPA to adopt a more modern process.  Cf., The T.J. Hooper, 60 F.2d 737 (2d. Cir 1932)(in defining legal duties even common practices must give ways to modern advances).

[13] Defendant argues that the circumstances strongly suggest that Kousisis left the forms out in his rush to meet the June 16th deadline.  This argument is not without evidentiary support.  For example, Alpha's bid arrived right before the deadline and Kousisis admitted he was scrambling to complete the package and travelling to obtain a signature from Alpha's principal.  His manner of assembling the package was haphazard and inconsistent.  He also operated out of different locations and although he insisted he could print the OSHA 300 forms from any location, the Plaintiff's own exhibits demonstrated his computer held multiple versions.  Moreover, the document he did supply, a different OSHA report, bore his handwriting and the notation "Attachment K," the letter he assigned to the OSHA 300 forms.  It would reasonable to infer that he would have reserve that notation for the OSHA 300 forms themselves, the required form, rather than any supplemental materials.  As noted, however, for the reasons set forth in this Opinion, we need not resolve whether Alpha's bid contained the disputed but ultimately irrelevant reports.

the missing forms are essentially a red-herring.  Even if the
bid package did not contain the OSHA 300 forms, their absence,
easily rectified, does not justify or sanctify DRPA's ultimate
decision to reject Alpha's bid for this simple reason – they did
not matter to DRPA at all.  The testimony at trial firmly
established that the OSHA 300 forms played no meaningful role –
indeed they seem to have played no role at all – in DRPA's risk
management and safety review.

DRPA proffered the testimony of Marianne Staszewski, who
holds the title of Director of Risk Management and Safety, to
explain her role in assessing Alpha's bid both as to the OSHA
forms and the EMF factors.  Her testimony was remarkable both as
to what she said and what she did not say.  Despite her
impressive title, Ms. Staszewski by her own admission does not
have any real role in assessing a contractor's safety records.
Nor does it appear that she has any particular expertise, work
history, or academic credentials in assessing issues of
workplace safety of any kind much less on the scale of
construction on a major bridge.

Unlike all the other defense witnesses who reviewed their
resumes and recited their credentials, Staszewski appears to
have joined the DRPA after working in some capacity in the
insurance industry.  Her role, as described by her own
testimony, was perfunctory and administrative, and as explained

14

below, involved at best the application of rudimentary arithmetic. When asked what role the OSHA forms had in her "safety" review, she candidly admitted she did not conduct a safety analysis or analyze the forms at all, and simply confirmed that OSHA forms were supplied, had numbers on them, and were signed.

When asked how she would conduct a safety analysis in the absence of OSHA forms and EMF factors, she was, in the view of this Court, visibly flummoxed, ultimately concluding that she, the Director of Director of Risk Management and Safety, would have to consult others at DRPA outside her department, on what factors to consider in conducting an analysis of a potential contractor's safety record. In short, fifty percent of the reason Alpha's bid was rejected was its failure to provide something DRPA did not really care about. It is hard to think of something more arbitrary or capricious.

### **Alpha's Lack of EMF Factors**

DRPA's second stated reason to reject Alpha's bid based on the rarely invoked and ultimately wrong conclusion that Alpha was "non-responsible" (as opposed to non-responsive) was the lack of reported EMF scores. EMF scores are derived from the frequency and severity of workplace accidents that occur at an employer's jobs, and are developed using payroll by classification that are compared to other similar

15

classifications and size of employers.  An EMF score is a
reflection of workers' compensation claims arising from a
bidders' prior jobs.  EMF does not take into account any
workplace incidents that injure non-employees, or do not result
in the filing of workers' compensation claims.  They also appear
to reflect only work done in Pennsylvania and New Jersey.

Three weeks after the bid openings, on July 7, 2016,
Jacurak prepared his bid review memorandum in accordance with
the Engineering Manual.[14]  He acted at the oral direction of Ash
who received her direction orally from the General Counsel's
Office.  Although both had a central role in the administration
of the project, and were proffered by DRPA as key players in the
process, neither had any idea at the time how DRPA intended to
deal with the issues they had themselves identified weeks
earlier.

In any event, Ash sent the two lowest bids - Alpha's and

_____

[14] Although described by DRPA as a "bid memorandum," Jacurak's
memorandum to Staszewski's department is really just an email
asking her department to proceed.  It was sloppy, perhaps due to
haste.  It purported to convey Alpha's OSHA 300 forms which
Jacurak believed DRPA did not have and asked in essence for an
expedited review because the relevant committee of the DRPA
board was poised to award the bid but cited a date in the past.
Staszewski's email response stating the obvious (although OSHA-
related, the attachment was not an OSHA 300 form) and Jacurak's
mea culpa reply (in essence "I should have been more careful")
is a curious, even odd, exchange.  A reader is left with the
impression the exchange is a pro forma exercise rather than part
of an objective, collaborative, review process.

Corcon's - to the various departments to review their piece of
the bids.[15] The Office of Business Development and Equal
Opportunity reviewed the MBE/WBE[16] solicitation and commitment
forms, the Office of the Inspector General reviewed the
political contribution disclosure certification forms, the
finance department reviewed the financial documents, and the
risk management department reviewed the OSHA requirements and
the EMF requirements.

It appears that all the departments deemed the bids of
Alpha and Corcon to be satisfactory, except for risk management.
Staszewski testified at length that her risk management
assessment centered almost entirely on a simple calculation of a
bidder's EMF score. Staszewski stated that her general practice
was that in order to receive her stamp of approval[17] on a

---

[15] Ash testified that she had broken the seal on the Alpha bid
and reordered the Alpha documents (but not the Corcon bid)
before sending them for review. She did this because the bid
documents form the basis for the contract after the bid is
awarded. Ash, an experienced contract administrator, familiar
with the bid specifications, and personally knowledgeable about
the contents of both the Corcon and Alpha bids, believed that
Alpha was the likely awardee.

[16] MBE stands for a minority owned business, and WBE stands for a
women owned business. Ownership by these individuals means the
business is at least 51% owned by such individuals or, in the
case of a publicly-owned business, at least 51% of the stock is
owned by one or more such individuals.

[17] Staszewski literally wrote the word "Approved" on the letter
provided by the bidder's insurance broker and returned it to
Jacurak.

bidder's risk assessment, she added together a bidder's EMF score for the previous three years and divided by three in order to compute a three-year EMF average.  If that average was 1.25 or less, a bidder would pass the DRPA's risk assessment.

Because Alpha did not do any work in New Jersey or Pennsylvania on its own in 2015, 2014, and 2013, it did not qualify for an EMF score.  As stated above, an EMF is a multiplier applied by workers' compensation insurers to the standard premium paid by insureds for workers' compensation insurance, relative to the anticipated exposure of risk as ascertained by accounting for the frequency and severity of workers' compensation claims against the insured over the last three complete reporting years as compared with other similar insureds.

The testimony of Alpha's insurance broker explained that the reason for a company's "does not qualify" status can be the result of it being a new business or that an existing company did not have any business in that state for that year.  A company that does not qualify for EMF is reported as a 1.0, which means that the company would pay standard market rates for workers' compensation insurance.  This is in contrast with a company that has an EMF score of, for example, .80, which would mean the company would pay 80 percent of the standard market rate for workers' compensation insurance.

Stasweski testified that her risk assessment analysis, and the requirement that a company have an EMF of 1.25 or less, shows that the company was not suffering from frequency or severity of losses, and it therefore would pass her risk assessment.[18]  Alpha's three-year average EMF in New Jersey was 1.00 (1.00 for the year 2013; 1.00 for the year 2014; and 1.00 for the year 2015) and Alpha's three-year average EMF in Pennsylvania was 0.935 (0.805 for the year 2013; 1.00 for the year 2014; and 1.0 for the year 2015).  Even though a 1.0 EMF in New Jersey and a .935 in Pennsylvania were both below Staszewski's 1.25 automatic approval threshold, Staszewski determined that she could not perform a risk assessment and safety analysis on Alpha, because Alpha's safety record was unknowable due to Alpha's lack of work in New Jersey and Pennsylvania for several years.[19]

Staszewski stated, however, that a new contractor or joint

_____

[18] DRPA never advised bidders that an EMF of less than 1.25 in Pennsylvania and New Jersey was required, and the IFB is silent as to this requirement.  Where the figure comes from is, like most things in this case, a mystery.  Staszewski testified that in her experience it was an industry standard, but when pressed for a source she could not cite an industry publication, organization, government agency, private authority, or any other origin for the standard or how it was derived.

[19] Staszewski did not wish to consider the EMF from Alpha's joint venture work in Pennsylvania, which included Alpha's recent work on the Ben Franklin Bridge.

venture could be approved through DRPA's risk management and
safety assessment without having EMFs in Pennsylvania and New
Jersey or only having 1.00 EMFs in those states.  Staszewski
could not explain why a 1.00, or "does not qualify," EMF score
could be acceptable in one instance, but not in another, such as
in Alpha's case here.  Additionally, as noted previously,
Staszewski could not describe what other factors or qualities a
bidder would need to possess in order to secure such her
department's approval.[20]

Despite DRPA's purported concern about a bidder's safety
record, it does not appear that any other safety data of the
bidders beyond the extent of filed workers' compensation claims
against those bidders is considered.  As noted above, EMF does
not take into account any incidents that injure non-employees.
For example, Staszewski agreed that if a bridge painter dropped
a beam into a bus or train car as it crossed the bridge, and it
killed all the passengers, as long as none of the bridge
painters were injured and none filed workers' compensation
claims, such an incident would not be reflected on the company's
EMF score, and correspondingly not considered in DRPA's "risk
assessment" of a bidder.

---

[20] Four of the seven bidders on this contract had a 1.0 EMF score
in New Jersey and Pennsylvania during the relevant time period
and technically "did not qualify" for this contract.

Corcon's OSHA 300 forms revealed that Corcon had seven workers' compensation injuries on the Commodore Barry Bridge during the Phase I project in 2015.  During the past three years, Alpha had none or one in all the states it has worked. Staszewski stated that she did not consider this information in her risk assessment and safety analysis.

Nothing in the record before the DRPA prior to its final decision to characterize Alpha as non-responsible justified that conclusion and nothing before this Court supports it either.  In fact all the evidence is to the contrary.[21]  For his part, DRPA's own chief engineer Michael Venuto testified that he had no reason to doubt that Alpha was a responsible party, with a good safety record, and with the requisite credentials and capability to competently sandblast and paint the Commodore Barry Bridge.

---

[21] DRPA did not refute the evidence that Alpha is qualified and capable of performing the work required of the Phase II project. Alpha's bid included copies of its QP1 and QP2 certifications from the Society for Protective Coatings ("SSPC"), which confirm that Alpha is capable of removing industrial hazardous paint. Alpha also has extensive experience painting major bridges throughout the United States, including but not limited to the Tobin Bridge in Massachusetts; the Huey Long Bridge in Louisiana; the Chesapeake Bay Bridge in Maryland; and the Amtrak train station and Benjamin Franklin Bridges in Philadelphia, Pennsylvania.  The value of these projects ranged from approximately $30 million to $75 million.  Alpha has also previously completed work for DRPA as part of a joint venture with another bridge painting contractor.  Alpha painted the Philadelphia approach of the Ben Franklin Bridge from 2007 to 2009.

21

This Court cannot conclude that Staszewski's inability to add three numbers together and then divide them by three for Alpha renders all of that meaningless.

DRPA's analysis of Alpha's workers' compensation experience was just as arbitrary and capricious as their consideration of Alpha's lack of OSHA 300 forms.  As we have noted, with the latter they rejected Alpha's bid for not including something DRPA did not consider.  While it is fair to say DRPA considered EMF factors, as simple as the analysis was, in that former instance DRPA rejected Alpha's bid for not providing something Alpha did not have and could not have because they performed no work in the narrow circumstances as defined by the bid book. Whether Alpha was actually safe, or had a good workers' compensation claim record, was irrelevant to the DRPA.

All of this demonstrates that DRPA's concerted effort to deem Alpha non-responsible was simply an effort to squeeze a square peg in a round hole.  No rational person would consider Alpha "non-responsible."  They were, however, non-responsive. Which begs the obvious question.  Why was their bid then, as DRPA's Procurement Manual directs, not rejected on that basis alone?  First of all, the time had passed for the DRPA under its procurement rules to declare Alpha non-responsive.[22]  This might

_____

[22] DRPA had ten (10) days from the unsealing of the bids to deem a bid package "non-responsive" and reject it on that basis.

at first blush suggest DRPA did not view them as such despite knowing as early as the very day of the bid opening that Alpha had not met the precise requirements of the bid specifications. The inescapable conclusion is that the reason is more subtle than that.[23]

Section A.10.3 of the IFB specifically required a bidder's "Experience Modification Factors for all work completed in the

---

[23] During cross-examination, DRPA's chief engineer Michael Venuto acknowledged that Corcon and certain DRPA employees had worked on a joint film project concerning the Commodore Barry Bridge that was actively and currently being promoted for broadcast either on television or the internet. The line of questioning appeared to be designed to suggest that the motive for DRPA's preferential treatment of Corcon might be the glamour of media attention in the otherwise staid world of bridge maintenance. The import of the testimony is merely that – a suggestion. There is insufficient evidentiary support for a finding that DRPA employees had a conflict of interest with Corcon and that this relationship tainted the bid process here. However, while evidence of an improper motive might explain outwardly arbitrary action it is not a required element of Plaintiff's claims here. What the testimony does show is the importance of transparency and an objective process. Ambiguity and opaqueness breed suspicion. Most people recognize that the absence of evidence is not necessarily evidence of absence. Public entities must act with integrity of course but it is equally important that they convey the appearance of integrity as well. The testimony also highlights the "form over function" nature of the reluctance to convey to Alpha the perceived deficiencies in its bid package during the process. Apparently, DRPA engineers can interact with Corcon employees at high levels concerning a film project while Corcon's bid application remains outstanding before those same DRPA engineers but no one at DRPA may communicate with Alpha about its bid. Even if the Court adopted DRPA's cribbed definition of transparency, that is not transparency.

State of New Jersey and the Commonwealth of Pennsylvania, covering the preceding three (3) reporting years." (Docket No. 18-1 at 16.) Corcon provided its EMF for the years 2016, 2015 and 2014, when it was required to provide EMF for the years 2015, 2014, and 2013. Since the year 2016 was only half over at the time the bids were unsealed that number was "green" and had no meaning[24] and the absence of a 2013 figure meant Corcon's bid was also non-responsive. In short, if DRPA had applied its rules uniformly and rejected Alpha's bid as non-responsive it would have been compelled to do the same to Corcon's. Instead, DRPA appears to have chosen to declare Alpha "non-responsible," a rationale that does not withstand even a cursory review much less scrutiny.

### Alpha Was Treated Differently and Corcon Was Afforded Preferential Treatment

The arbitrary and capricious risk assessment in this case is sufficient to warrant the relief sought by Alpha, but there is more to this story – much more – because not only did it treat Alpha's bid in an irrational way, as we find below DRPA went out of its way to shepherd the Corcon bid through the process.

### Despite Denying Alpha the Same Opportunity, The DRPA Allowed Corcon to Supplement Its Bid

---

[24] Stasweski testified an EMF factor is computed only after the claim experience for a full calendar year.

As we have noted, Corcon's submitted bid did not meet the
bid specifications in what DRPA itself contends is a material
way.  Contrary to Section A.10.3 of the IFB, Corcon only
provided complete EMF's for the years 2015 and 2014.  Like
Alpha's bid, Corcon's bid as it relates to the safety and risk
assessment metrics was incomplete and therefore non-responsive
to the bid specifications.  Not deterred, Staszewski testified
that she contacted Corcon's insurance broker, a woman she had
known for many years and was friendly with, in order to obtain
Corcon's EMF for the proper years.  The broker complied and sent
Staszewski figures for 2013 allowing her to complete her
arithmetic and approve Corcon's bid.[25]

Despite its protestations to the contrary, Alpha was not
afforded the same opportunity to supplement its safety and risk
assessment data.  Staszewski did call Alpha's broker as well but

---

[25] The Court notes, as Plaintiff has, that the 2013 numbers were
exactly the same numbers to three decimal points as Corcon's
numbers for 2014.  Based on the Court's understanding of how EMF
figures are calculated and the nature of the data included in
the calculus (number of man-hours assessed against injuries over
the course of a year at a large company by state) the chances
that a company would have the exact same EMF to three decimal
points in the same state two years in a row seems akin to
winning the lottery.  Indeed, the other numbers differ by state
and year consistently.  Regardless of what number
Staszewski obtained from her colleague, the issue is not the
number but the decision of DRPA to not only seek it but use it
to award the contract to Corcon in violation of its own
Procurement Manual and the bid specifications.

merely to confirm that it did not have sufficient work in New Jersey or Pennsylvania in the relevant years to generate an EMF. Confirming that something does not exist is not the same thing as allowing someone to provide additional information that does exist.  This is especially glaring in light of Alpha's repeated and ignored communications offering to provide any additional information required to assess its bid.  While it would have been within DRPA's right to deny that request, they imposed no such rule on Corcon, not only allowing them to supplement their bid but arranging themselves for the key piece of missing information that allowed for Staszewski's immediate approval and ultimately DRPA's final approval of the Corcon bid.

### DRPA Unilaterally Modified Corcon's Bid In Its Favor

In the next day or two after the June 16, 2016 bid opening, Jacurak reviewed all of the bids by inputting numbers from the bids into a spreadsheet.  He determined that three of the bidders, Liberty Maintenance, Inc., Allied Painting, Inc., and Corcon, had included a mobilization and clean-up line item that exceeded 7.5% of the total bid, excluding mobilization and clean-up and site coordination and conditions in violation of the bid specifications.  The IFB advised all bidders that the line item for mobilization and clean-up would be limited to a maximum of 7.5% of the total bid, excluding the amounts for mobilization and clean-up and site coordination and conditions.

26

According to DRPA, the IFB authorizes DRPA to limit the price bid for mobilization and clean-up to the specific percentage contained in the IFB (IFB at Q-1), and the IFB permits DRPA to correctly compute the amount of the total bids for accurate comparison purposes (IFB at A-3). Based on this interpretation of the IFB, Jacurak corrected the total bid amounts for the Liberty, Corcon and Allied. When corrected, the resulting total bids were: Liberty $25,456,415.25; Corcon $17,830,290.00; Allied $18,326,725.00. Corcon's corrected total bid amount made Corcon the apparent lowest bidder, approximately $55,710 lower than Alpha's bid.

The problem with Jacurak's conclusion that he could change the bid – if indeed he was the one who made that decision - and the subsequent recalculation is two-fold, one substantive, the other procedural. First, none of the provisions in DRPA's Procurement Manual or the IFB allow the DRPA to restate, or in effect change, the line item for mobilizations and clean-up costs. The provisions that come closest, Sections A.7.5 and A.7.6 of the IFB, are not nearly as broad as DRPA contends. These sections, when fairly read both independently and in context of the bid package as a whole, clearly address instances in which the bidder commits a mathematical error of some kind. An example might be a bidder who promises to provide 10 widgets at $.10 each but extends the line item out as $1.10 rather than

$1.00.  In such a situation, anyone involved in the process, a bidder, a contract administrator, or a reviewing court would understand the bidder intended to quote a price of $1.00 and not $1.10.

But as Jacurak candidly admitted in his testimony, Corcon's lump sum quote for that particular item was not the result of any discernable mathematical error amenable to a simple correction.  It was not a "miscalculation."  Corcon simply bid more that the IFB allowed for that item.  As Jacurak also made clear, and the clear terms of the IFB dictate, the maximum of 7.5% on mobilization and clean-up costs was just that – a cap or maximum.  While the precise numerical cap was defined after a process of subtraction of figures chosen by the bidder and simple multiplication, the line item itself was not the sum, derivative, or product of a rote mathematical process applied to otherwise given or known numbers.  It was a number chosen by the bidder who at the same time had the incentive to keep it as low as possible to lower the overall bid.

Stated differently, so long as the cap was not exceeded a bidder could choose any number it wanted for the line item – so long as it did not exceed the cap.  Choosing a number in excess of the cap does not subject the line item to recalculation

28

according to the whim of DRPA.[26]  It makes the bid non-responsive and therefore unacceptable.[27]  But as other aspects of this Opinion should make clear, for reasons unknown, DRPA was not inclined to reject Corcon's bid.

The second, and glaring, problem with the recalculation of Corcon's bid is the gross time delay in implementing it and the fact that it occurred after DRPA had already decided to reject Alpha's bid.  By Friday, June 17th, by Ash's recollection or certainly no later than Tuesday, June 21, 2016, if Jacurak's conflicting testimony is believed, Ash, Jacurak, and DRPA's legal counsel knew, despite whatever problems there might be with Alpha's bid package, that Corcon – and not Alpha - would be the lowest bidder if DRPA's unilateral recalculation of Corcon's mobilization and clean-up costs was allowable.

Instead of immediately alerting Liberty, Allied, and Corcon and the rest of the bidders of DRPA's recalculation of these three bids, and the effect it would have on the lowest bidder determination, DRPA waited until August 9, 2016 to send a letter to these three bidders, copied to the other bidders, confirming

---

[26] To be clear, under DRPA procurement rules the bidder may not modify its bid once opened.  And it should be obvious that to allow DRPA unbridled discretion to change a line item it deemed too high (or too low) would render the bid process as a whole a hollow enterprise.

[27] DRPA Procurement Manual 5.d.

that they would accept and be bound by the mobilization and
clean-up costs as calculated by the DRPA.[28]  This was almost two
weeks after DRPA rejected Alpha's bid for being "not
responsible" on July 29, 2016, and almost two months after the
bids were opened.

If DRPA was permitted to recalculate a bidder's
mobilization and clean-up costs, and Corcon's bid was otherwise
in compliance with the IFB, why would DRPA have not simply
informed all the bidders that Corcon was actually the lowest
bidder in mid-June or at least re-set the numbers for everyone
to see in the context of the on-going bid review?  Doesn't the
DRPA, as a public entity, have an obligation to hold the true
lowest bidder to its price?

The answer is obvious.  At best, the unexplained delay
highlights the bid review process as the black box it
represents, obscure and unexplained, and lacking any indicia of
transparency or the hallmarks of a deliberative process.  At
worst, the delay simply puts the lie to the notion that DRPA
believed it had the legal authority to recalculate the bid and

---

[28] Several witnesses testified that they understood that they
were precluded from ex parte contacts with the potential
contractors during the bidding process and described this a
tenet of transparency.  In general, this is understandable and a
commendable practice.  However, the use of this procedure late
in the process confirms that DRPA could indeed remain
"transparent" and simultaneously communicate with bidders when
issues arose and fairness dictated it.

exposes the August 9th letter writing exercise as a post-hoc rationalization designed to create the illusion rather than the substance of a proper bid review.

### Despite a Claim of Transparency, the DRPA's Deliberate Process is Opaque and Unreviewable

In addition to DRPA's superficial safety and risk assessment and the favored treatment it afforded Corcon, an evaluation of every other aspect of the bid review and award process supports the conclusion that DRPA acted in an arbitrary and capricious manner.  While we hold that none of these things standing alone would be sufficient to warrant the relief Alpha seeks, they are nonetheless significant evidence of DRPA's apparent intent to conceal rather than disclose the reasons for its decisions.  Such reticence, otherwise unjustified, makes it more likely than not that the stated reasons for a decision are not the real ones, a particularly egregious form of capriciousness.

On or around July 8, 2016, Staszewski stamped "approved" as to Corcon's risk assessment and rejected Alpha's.  By her own testimony, however, Staszewski was not the decision-maker who deemed Alpha to be "not responsible."  Almost three weeks passed until July 28, 2016, when Ash, six weeks after the bids were opened, emailed an undated[29] rejection letter to Alpha revealing

---

[29] Ash explained that the letter was undated because she was in a

for the first time that DRPA considered them "not responsible" because of their failure to provide suitable OSHA and EMF information.  A reader of the letter would be forgiven for concluding that Ash had made the decision to reject Alpha.  That reader would be wrong.  Ash was merely a scribe who testified adamantly that she was not the decision-maker who deemed Alpha "not responsible."  As we have noted, the same is true for Jacurak and Venuto as well.

If neither the chief or senior engineer, nor the acting manager of contract administration, nor the director of risk management and safety made the decision that Alpha was "not responsible," who did?  That question was posed to each of these DRPA employees, and none could provide the answer.  This testimony depicts the decision-maker as the apparition of the Wizard of Oz before the curtain is thrown open.  Only here, the curtain remains closed tight.

One evident reason for this iron curtain is the invocation of attorney-client privilege at every turn when these DRPA employees were questioned about any decision-making.  This appears to be a result of counsel being intimately involved from the beginning and throughout the bid review process even before the prospect of a bid challenge and litigation.

---

rush to leave DRPA's offices because of heightened security associated with a Democratic National Convention event.

The attorney-client privilege is deeply embedded in our jurisprudence, and the privilege recognizes that sound legal advice or advocacy serves public ends and rests on the need to "encourage full and frank communication between attorneys and their clients." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Preserving the sanctity of confidentiality of a client's disclosures to his attorney promotes an open atmosphere of trust, and where the privilege is applicable, it must be given as broad a scope as its rationale requires. See id. There are few privileges more sacrosanct or more worthy of our respect in a land governed by law.

This privilege extends fully to corporations and public entities such as the DRPA that receive legal advice. See In re Grand Jury Subpoenas Duces Tecum Served by Sussex County, 574 A.2d 449, 455 (N.J. Super. Ct. App. Div. 1989) (finding that the attorney-client privilege is fully applicable to communications between a public body and an attorney retained to represent it).

But, as the Supreme Court has recognized, "'the administration of the privilege in the case of corporations presents . . . special problems. Communications which relate to business rather than legal matters do not fall within the protection of the privilege.'" Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp., 253 F.R.D. 300, 305-06 (D.N.J. 2008) (quoting Commodity Futures Trading Comm'n v. Weintraub,

471 U.S. 343, 348 (1985)).  Thus, the general rule is "while legal advice given to a client by an attorney is protected by the privilege, business advice generally is not."  Id. (citation omitted).  In order to prevent corporate attorneys from abusing the privilege, the person claiming the privilege should demonstrate that the communication would not have been made but for the client's need for legal advice or services.  Id. (quotations and citations omitted).  Nor can a lawyer assume the role of executive decision-making and by virtue of his or her status as a lawyer deem all his or her communications privileged.

Because of the procedural posture of these proceedings, the scope of DRPA's invocation of the attorney-client privilege was not assessed to determine what communications between DRPA staff and in-house counsel were related to legal issues or business issues.  Instead, the DRPA blanketed all of its deliberations – from the initial bid review by internal DRPA staff through the "public" consideration by the Operations Committee and Board of Commissioners – under the cloak of attorney-client privilege.  This is an overbroad use of the privilege and a perfect recipe for abuse.

To be clear, the Court does not suggest that DRPA was required to waive any valid privilege to make out its defense, and as the specter of litigation arose from the decision to

reject Alpha's bid the scope of those communications privileged certainly expanded.  But DRPA cannot have it both ways.  It cannot delegate executive functions to lawyers, have those lawyers dictate the actions of non-lawyers[30] who communicate with the public,[31] cloak the entire process in the privilege and then assert in the same breath that the process is transparent.

DRPA has chosen through their own procedures to leave a void where disclosure of a rational, fair and deliberate process

---

[30] A "non-lawyer's statements do not automatically become privileged simply because, at some point, that person interacted with or learned from an attorney."  HPD Labs., Inc. v. Clorox Co., 202 F.R.D. 410, 417 (D.N.J. 2001) (citation omitted).  "To hold otherwise would give in-house counsel a strategic incentive to impart basic legal knowledge to corporate employees and then, during litigation, claim that statements made by those employees in the regular course of business are protected because they build on or derive from counsel's teachings in some manner. Such a construction would subject the privilege to abuse and, hence, must be avoided."  Id. (citation omitted).

[31] The privilege "protects only those disclosures - necessary to obtain informed legal advice - which might not have been made absent the privilege."  Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991) (citation omitted).  The attorney-client privilege is waived when privileged information is disclosed to a person outside of the attorney-client relationship.  Westinghouse Elec. Corp., 951 F.2d at 1424.  The act of disclosing privileged information to a third-party indicates that the client did not intend to keep the communication secret.  In re Teleglobe Communications Corp., 493 F.3d 345, 361 (3rd Cir. 2007).  Specifically applicable to the case here, "a communication between an attorney and client will not be privileged if the communication was made with the understanding that it would be imparted to third parties." Robertson v. Cent. Jersey Bank & Trust Co., 834 F. Supp. 705, 708 (D.N.J. 1993) (citations omitted).

is paramount.  A contrary rule would allow the mere presence and involvement of a lawyer to shield public agencies from accountability.  No public agency should be allowed to involve in-house counsel in every business decision in order to shield its operations from the public under the guise of attorney-client privilege.[32]  That is not the law or their public duty.

Further evidencing DRPA's lack of transparency is DRPA's refusal to communicate with Alpha when it inquired on the status of the contract.  On July 7, 2016, Kousisis had not yet heard from DRPA regarding the Contract, and telephoned Vijay Pandya, Jacurak's manager.  Pandya did not answer, and Kousisis followed up on this same date with an e-mail to Pandya, Ash, and Jacurak.

---

[32] In order to "prevent corporate attorneys from abusing the privilege by using it as a shield to thwart discovery, the claimant must demonstrate that the communication would not have been made but for the client's need for legal advice or services." Leonen v. Johns-Manville, 135 F.R.D. 94, 99 (D.N.J. 1990) (citation and quotation omitted).  Moreover, an attorney acting as a business executive, rather than "peculiarly within the province of an attorney at law," cannot assert the attorney-client privilege.  Id. (citing Metalsalts Corp. v. Weiss, 184 A.2d 435, 440 (N.J. Super. Ct. Ch. Div. 1962) (finding that in-house counsel "undertook to serve as an investigator and not as a lawyer," and that the "service rendered could have been rendered by any corporate agent who was not a lawyer," thus barring the application of the attorney-client privilege)); see also Rowe v. E.I. duPont de Nemours & Co., 2008 WL 4514092, at *8 (D.N.J. Sept. 30, 2008) (citation omitted) (explaining that "modern corporate counsel have become involved in all facets of the enterprises for which they work," and that "in-house legal counsel participates in and renders decisions about business, technical, scientific, public relations, and advertising issues, as well as purely legal issues").

Kousisis' email stated: "I am just reaching out to you to verify
that nothing else is needed from Alpha for the above subject
project [(i.e., Contract No. CB-31-2016)], prior to the Board
meeting of July 20, 2016." (Pl. Ex. 7; Tr. 52:1-3.)  Read
receipts for the e-mail confirm that Ms. Ash and Mr. Pandya
received and read the e-mail on July 7, 2016.  Yet, no one from
DRPA responded to Mr. Kousisis' e-mail, and no one from DRPA
informed Kousisis about any issue with Alpha's OSHA 300 forms or
any other perceived problems with Alpha's bid.

Even though Jacurak, Ash, and Staszewski testified that
they were precluded from communicating directly with bidders,
none of these DRPA employees could point to a DRPA rule that
disallows such contact, or directs that DRPA staff completely
ignore an apparent lowest bidder's inquiries into the status of
the contract award process.  As we have noted, when they wanted
to do so, DRPA had a procedure to communicate to bidders that
was transparent and procedurally fair to all.  And they used it
in this very matter in their effort to lower Corcon's bid.  Nor,
as Staszewski's testimony demonstrates, did DRPA have any
difficulty making ex parte contact with a bidder's agents.

Also troubling about DRPA's contract award process is the
fact that there was no public discussion or public deliberation
of what transpired with the review of Alpha's and Corcon's bids.
There also was no public discussion or deliberation of the

37

determination that Corcon should be awarded the contract.  All
of the discussions and deliberations were conducted in
"executive sessions" that excluded public access.  Only the 30-
second vote to approve the Operations Committee's recommendation
to award the contract to Corcon was made public.

DRPA's procurement manual provides that "in order to be
considered a responsible bidder . . . the bidder/offerer must
possess the capability to fully perform the contract
requirements in all respects and the integrity and the
reliability to assure good faith performance."  (Def. Ex. 3 at
Ch. 6.; Tr. 436:14-18.)

Even after three days of testimony and substantial briefing
and argument, the Court is still left to guess who made the
decision to deem Alpha incapable of fully performing "the
contract requirements in all respects and the integrity and the
reliability to assure good faith performance."  Even if the
decision to find Alpha "not responsible" was proper under DRPA
guidelines, the fact that no one outside of DRPA knows the who,
what, where, when, how of that decision is more evidence the
decision was arbitrary and an abuse of discretion.[33]

---

[33] Our conclusion in this respect is buttressed by the Open Public
Meetings Act (N.J.S.A. 10:4-7).  More specifically, N.J.S.A.
10:4-12b(7) states that "[a] public body may exclude the public
from that portion of a meeting involving ... [a]ny matters
falling within the attorney-client privilege, to the extent that
confidentiality is required in order for the attorney to

**What Is the Appropriate Remedy?**

The foregoing findings fully support a determination that DRPA's actions relating to the procurement and award of Contract CB-31-2016 were an abuse of discretion, arbitrary, and unreasonable.  Allied Painting, Inc. v. Delaware River Port Auth. of Pennsylvania & New Jersey, 185 F. App'x 150, 151 (3d Cir. 2006) (citing Princeton Combustion Research Labs., Inc. v. McCarthy, 674 F.2d 1016, 1021–22 (3d Cir. 1982)).  Having reached that conclusion, the Court must determine the remedy for DRPA's arbitrary actions.

Even though courts have recognized the necessity of exercising restraint in interfering with procurement decisions, when a court has found that an agency's decision lacks any reasonable basis, the court must exercise its discretion by balancing three factors: (1) the practical considerations of efficient procurement of supplies for continuing government operations; (3) the public interest in avoiding excessive costs;

---

exercise his ethical duties as a lawyer."  Thus, our Legislature has expressly recognized that public scrutiny of matters traditionally falling within the purview of the attorney-client privilege is often inimical to the public interest, notwithstanding that a governmental entity is the client.  See Pillsbury v. Freeholders Cty. of Monmouth, 133 N.J. Super. 526, 535, 337 A.2d 632 (Law Div. 1975), aff'd 140 N.J. Super. 410, 356 A.2d 424 (App. Div.1976); see also Biunno, New Jersey Rules of Evidence, Comment 2 to Evid. R. 26 (1989).

and (3) the bidder's entitlement to fair treatment through
adherence to statutes and regulations.  Princeton Combustion
Research Labs, 674 F.2d 1016 at 1021-22 (citing Sea-Land Serv.,
Inc. v. Brown, 600 F.2d 429, 434 (3d Cir. 1979)) (explaining
that "a district court's discretion as to whether or not to
grant a preliminary injunction cannot be predicated upon just
any violation of applicable statutes or regulation; only if the
violation, if committed, renders the agency decision irrational
may the district court go on to consider whether a balancing of
the three Sea-Land factors justifies the grant of a preliminary
injunction with all the attendant disruption of orderly
procurement processes").

DRPA's determination to award Corcon the contract was
irrational because it arbitrarily deemed Alpha to be a non-
responsible bidder by violating its own procurement rules to
recraft Corcon's bid into the lowest responsive and responsible
bid.  At 2:30 pm on June 16, 2016, Alpha was the lowest
responsive, responsible bidder for Contract CB-31-2016, and
Corcon was not.  DRPA's arbitrary and capricious actions over
the next two months flipped that result without any meaningful
justification or rational process.

An aggrieved bidder such as Alpha cannot obtain money
damages as a result of DRPA's conduct.  M. A. Stephen Const. Co.
v. Borough of Rumson, 288 A.2d 873, 874 (N.J. Super. Ct. Law.

40

Div. 1972), aff'd sub nom., M. A. Stephen Const. Co. v. Borough of Rumson, 308 A.2d 380 (N.J. Super. App. Div. 1973) (quoting Commercial Cleaning Corp. v. Sullivan, 222 A.2d 4, 7 (N.J. 1966)) (other citations omitted) ("The general rule is that an improper award of a public contract to one other than the low bidder does not entitle the low bidder to a recovery of damages from the public body."). Accordingly, an injunction is appropriate where there exists a threat of irreparable harm such that legal remedies are rendered inadequate. Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).

Irreparable harm would result if DRPA is not enjoined from proceeding on the contract with Corcon. As the New Jersey Supreme Court observed forty years ago:

> Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside.

Terminal Const. Corp. v. Atl. Cty. Sewerage Auth., 341 A.2d 327, 330 (N.J. 1975); see also Cubic W. Data, Inc. v. New Jersey Tpk. Auth., 468 F. Supp. 59, 69 (D.N.J. 1978) ("The general citizenry is also entitled to a guarantee that public contracts are being awarded on the basis of full compliance with the bidding

41

guidelines.").

With these observations in mind, there is no need to start the bidding process over, as such a remedy would be adverse to the public good, and unfair to Alpha.  See In re Jasper Seating Co., Inc., 967 A.2d 350, 358 (N.J. Super. Ct. App. Div. 2009) (quoting Marvec Const. Corp. v. Twp. of Belleville, 603 A.2d 184, 189 (N.J. Super. Ct. Law. Div. 1992)) (noting that "'rebidding a contract is fraught with certain dangers,'" such as higher contract prices, discouraged low bidders that drop out, and rebidding until the "favorite son" candidate is awarded the contract).  Alpha is fully capable and qualified to perform the work required under the contract, and it is ready to mobilize immediately.  The Court will, and must, flip the award back to its original and proper result.  "Only by granting the injunctive relief sought by plaintiff can this court ensure that the door remains tightly closed to the evils which are to be averted." Disposmatic Corp. v. Mayor & Council of Town of Kearny, 393 A.2d 610, 613 (N.J. Super. Ch. Div. 1978).

Consequently, judgment must be entered in Alpha's favor on its claim that DRPA was arbitrary and capricious in awarding Contract CB-31-2016 to Corcon.[34]  DRPA is enjoined from

---

[34] The Court will not opine as to whether DRPA violated Alpha's due process rights, New Jersey's Open Public Meetings Act, N.J.S.A. 10:4-6 to -21, or Pennsylvania's Sunshine Act, 65 Pa. Cons. Stat. 701 to 716.  Instead, the facts that Alpha presented

proceeding on the contract with Corcon, and DRPA is directed to award the contract to Alpha, which is the lowest responsive and responsible bidder in accordance with DRPA's procurement rules.

## CONCLUSION

DRPA's chief engineer, senior engineer, the acting manager of contract administration, and the director of risk management and safety all testified that the transparency of DRPA's bidding processes is DRPA's paramount concern.  Despite these proclamations, the evidence has revealed that DRPA's bid review process only presents an illusion, and not the reality, of transparency.  What occurred between June 16, 2016, when Alpha was declared the apparent lowest bidder, and July 28, 2016, when Alpha's bid was rejected, in particular demonstrates the complete lack of transparency as to how DRPA actually awards contracts.  The only thing clear about DRPA's process is that it is deeply and dramatically flawed, Kafkaesque, and in need of substantial reform.[35]

This state of affairs is not without consequence.  Over the next several years, the DRPA will oversee more than $700 million

---

to prove such violations support the Court's conclusion that DRPA acted arbitrarily and capriciously.

[35] DRPA has adopted a Resolution declaring "the right of the public to be present at all meetings of the Authority Board and to witness the **deliberation**, policy formulation and decision-making of the Authority." (Pl. Ex. 26 (emphasis added).)

in public contracts, most of which involve the four major crossings of the Delaware River in the Philadelphia region and a major rail line. The manner in which those contracts are awarded and administered is, and ought to be, a matter of important public interest. Indeed, as we and other courts have noted, such a vital interest correctly informs this Court's judgment on the propriety of an injunction on this record and what that record has revealed about the contracting practices of DRPA.

Nonetheless, this Court recognizes the unusual nature of the remedy provided to Alpha in this matter. This Court should not be in the business of awarding bridge painting contracts or substituting its judgment for an agency charged with that important responsibility. But it is equally true that this Court should not stand idly by when a public agency, borne of Congress and financed by two states and the traveling public, acts in violation of its own rules, applies those same rules differently to different entities, creates a façade of rationality and transparency, and fails to provide this Court with any meaningful record to review its decision. On this record, an obligation of deference should not become an abdication of responsibility.

As we have noted, after three days of trial and dozens of exhibits this Court still has no idea who made the decision to

award the contract to Corcon or by what deliberate process that decision was made. There are no emails, no minutes of discussions or debate, no memoranda among decision-makers, no witnesses to take responsibility.  Instead, there is six weeks of silence, a carefully orchestrated but ultimately hollow administrative denial, and another three weeks of pro forma executive action.  Equally important, the stated reasons have fallen away as apparent subterfuge.  The bidders, both winners and losers, and the public, deserve better from their appointed officials.

The Court will enter a permanent injunction awarding Contract No. CB-31-2016 (Phase II) to Alpha.  The Court will enter the appropriate Order and will direct Alpha to submit a form of judgment within three (3) days.


　　　　　　　　　　　　　s/ Noel L. Hillman
　　　　　　　　　　　　　NOEL L. HILLMAN, U.S.D.J.

Dated:  September 23, 2016
At Camden, New Jersey

45